IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| LORENZO LINDSEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CV 120-054 |
| | ) | |
| DARRIN MYERS, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

_____

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
_____

Petitioner, an inmate at Autry State Prison in Pelham, Georgia, brings the above-captioned petition pursuant to 28 U.S.C. § 2254.  Having considered all the relevant pleadings, for the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** Petitioner's § 2254 petition be **DENIED**, this civil action be **CLOSED**, and a final judgment be **ENTERED** in favor of Respondent.

## I.      PROCEDURAL BACKGROUND

This habeas case is the culmination of two murders and four jury trials that began in 1997 with the shooting death of 83-year-old Rosa Barnes in Augusta, Georgia.  Lindsey v. State, 760 S.E.2d 170, 172 (Ga. 2014) ("Lindsey II").  A bullet fired in a drive-by shooting killed Ms. Barnes while she slept in her bed.  Accused of being an occupant in the vehicle from which the bullet was shot, Petitioner was convicted at the first trial, secured a reversal on appeal, and was acquitted on retrial.  Id. at 172 n.2.  Marcus Taylor testified for the State at both Rosa Barnes murder trials.  Id. at 172.

On August 11, 2002, after Petitioner's acquittal and release, John Lawton murdered Mr. Taylor at a Citgo store parking lot in Augusta, Georgia, by shooting him multiple times in the torso and head.  Id.  Eight days later, a grand jury returned an indictment for malice murder against Petitioner, Mr. Lawton, Charles Hankerson, and William Abrams.  Id. at n.1.  The State alleged the defendants conspired to murder Mr. Taylor as retribution for him testifying for the State in the Rosa Barnes murder trial.  (Id.)  The State dropped the charge against Mr. Abrams and struck a plea deal with Mr. Hankerson, who agreed to testify against Petitioner and Mr. Lawton.  Id.  On December 9, 2003, a jury found Petitioner and Mr. Lawton guilty, and on January 21, 2004, the trial judge sentenced Petitioner to life imprisonment plus five years to be served consecutively.  Id.; Lindsey v. State, 651 S.E.2d 66, 68 n.1 (Ga. 2007) ("Lindsey I").  Mr. Lawton's conviction was affirmed on appeal, and the Georgia Supreme Court reversed Petitioner's conviction and granted him a new trial.  Lindsey I, 651 S.E.2d at 68.

Petitioner's second trial occurred January 5 through 9, 2009, and the jury again found him guilty of malice murder and criminal solicitation to commit murder.  Lindsey II, 760 S.E.2d at 172 n.1.  Petitioner received the same life sentence, the trial court denied a motion for new trial, and the Supreme Court of Georgia affirmed the conviction.  Id.  Retained attorney Steven P. Berne represented Petitioner at the second trial.  Retained attorney Brian Steel represented Petitioner post-trial by preparing the motion for new trial and appeal.  Mark Yurachek represented Petitioner in connection with his state habeas petition, which the Superior Court of Johnson County denied.  (Doc. no. 10-4, pp. 34-49.)

## II.     SUMMARY OF  SECOND TRIAL

The Court has read the entire trial transcript thoroughly and summarizes the more salient portions.[1]

### A.     Testimony of Denise Mobley

Denise Mobley heard the gunshots while driving her car, saw a man running away from the Citgo store, parked her car at the scene, looked at the body and recognized Mr. Taylor, and called the Taylor family to notify them.  (Tr. 1102-23.)  She only saw the shooter from the back and could not identify him, but she described him as light-skinned and bald.  (Tr. 1106.)  Ms. Mobley testified Mr. Taylor had a prior conviction for possession of cocaine.  (Tr. 1110.)  The government objected to this testimony and asked for a limiting instruction, which the trial court overruled based on Mr. Berne's explanation that his defense theory hinged on showing this was not a revenge killing by Petitioner, but instead a drug-related crime in a dangerous part of Augusta.  (Tr. 1110-15.)  Ms. Mobley testified that, before the first Taylor murder trial, she received anonymous phone calls attempting to intimidate her into not testifying, which prompted her to call law enforcement out of concern for the safety of herself and her children.  (Tr. 1121-23.)

### B.     Testimony of Investigator Kenny Lynch

Investigator Kenny Lynch testified concerning the Rosa Barnes murder investigation and trial.  (Tr. 1144.)  He was on duty that night and called to the scene of the drive-by shooting.  (Tr. 1146.)  Ms. Barnes was asleep in her bedroom when the gunfire killed her.  (Tr. 1146.)

---

[1]The Court cites to the trial transcript ("Tr.") using the page numbers provided by the state habeas court.  The trial transcript may be found in Respondent's Exhibits 6(e)-6(g).  (Doc. nos. 10-10, 10-11, 10-12.)

Two others were injured but did not die. (Tr. 1146.) The shots were fired from a vehicle as it passed by Ms. Barnes's residence, and some of the bullets penetrated her residence and entered her bedroom. (Tr. 1146.) The bullets were fired from a high-powered assault rifle. (Tr. 1147.) Investigator Lynch determined the vehicle involved in the drive-by shooting was an Oldsmobile Toronado owned by Terry Holmes. (Tr. 1144-47.) Charged with the crime were Mr. Holmes, Theodore Allen (a/k/a "Flight"), and Petitioner (a/k/a "Little Dex"). (Tr. 1150.) Mr. Allen was with Petitioner at the time of Petitioner's arrest. (Tr. 1150.)

Mr. Taylor testified at both Rosa Barnes murder trials on behalf of the State. (Tr. 1151.) Mr. Taylor testified that, from the street, he observed Mr. Holmes inside the Toronado along with two other people at the time of the drive-by shooting. (Tr. 1151-54.) When Mr. Taylor came into the courtroom to testify during the first Rosa Barnes trial, there was an obvious reaction of animosity by Petitioner and the other defendants. (Tr. 1155.) It was obvious Petitioner did not like Mr. Taylor. (Tr. 1155-56.) However, Investigator Lynch does not recall the defendants reacting in this manner when Mr. Taylor testified at the second Rosa Barnes trial. (Tr. 1157.) On cross-examination, Investigator Lynch explained that, while Mr. Taylor identified Mr. Holmes as driving the Toronado and Mr. Allen as the back seat passenger, Mr. Taylor could not identify the front seat passenger and expressly stated he did not see Petitioner in the car. (Tr. 1167-69.)

### C.      Fact Stipulation

The trial judge read to the jury the following stipulation of the parties:

The parties hereby stipulate that the defendant, Lorenzo Lindsey, was found guilty on October the 28th, 1997, of the murder of Rosa Barnes. On November the 30th, 1999, his conviction was reversed by the Supreme Court of the State of Georgia. On March the 9th, 2000, his retrial ended with a not guilty verdict.

(Tr. 1237.)

### D.      Direct Examination of Charles Hankerson

The Court permitted the State to read into the record Mr. Hankerson's testimony from the first trial because he died before the second trial.  Mr. Hankerson served prison time with Petitioner and Mr. Lawton at Macon State Prison in 1997.  (Tr. 1299.)  He and Petitioner were in the same dormitory.  (Tr. 1299-1300.)  Petitioner explained to Mr. Hankerson he had been convicted for the murder of Rosa Barnes, and "Mr. Taylor had snitched on them in the case and that he wanted to get somebody to knock Mr. Taylor off."  (Tr. 1302-03.)  While discussing this topic in the prison yard one day, Mr. Lawton said "he would be willing to kill Marcus Taylor for Petitioner once we got out of prison."  (Tr. 1303.)  Petitioner planned to pay for the hit and wanted Mr. Taylor killed because Mr. Taylor testified against him in the first trial, he was waiting on a retrial along with Mr. Allen, and "they needed Mr. Taylor out of the way."  (Tr. 1304.)  Two weeks before Mr. Hankerson was released from prison, Petitioner asked Mr. Hankerson if he was still willing get Mr. Taylor "taken care of," and Mr. Hankerson replied he did not know.  (Tr. 1306.)  Mr. Hankerson described Mr. Taylor as a good friend of his.  (Tr. 1306-07.)

Three weeks before the shooting, Mr. Hankerson saw Mr. Taylor, and Mr. Taylor asked whether Petitioner's group of friends still wanted him dead.  (Tr. 1308-09.)  Mr. Hankerson replied yes and warned Mr. Taylor to stay away from the Kent Street area.  (Tr. 1309-10.)  Petitioner, now out of prison after his acquittal on retrial of the Rosa Barnes case, asked Mr. Hankerson to kidnap Mr. Taylor, and Mr. Hankerson refused.  (Tr. 1310.)  Petitioner and Mr. Hankerson argued about killing Mr. Taylor, with Mr. Hankerson telling Petitioner he should do it himself.  (Tr. 1311-12.)

On the night of the shooting, Mr. Lawton left his Dodge Intrepid at Mr. Hankerson's house along with a note, which caused Mr. Hankerson to go out looking for Mr. Lawton. (Tr. 1313-14.)  He asked Petitioner where Mr. Lawton was, and Petitioner said Mr. Lawton was gone and it was too late. (Tr. 1314.)  Mr. Hankerson told Johnnie Martin to tell Mr. Taylor he needed to see him and it was very important. (Tr. 1314-15.)  Mr. Hankerson drove to the Citgo store and warned Mr. Taylor to get out of there because "somebody coming up here to kill you." (Tr. 1315.)  Mr. Taylor was high on drugs and replied he was tired of running. (Tr. 1315.)  Mr. Hankerson warned him again before Mr. Lawton showed up. (Tr. 1316.)  Mr. Hankerson motioned for Mr. Lawton not to kill Mr. Taylor, then told Mr. Taylor again to leave. Mr. Lawton returned to the scene and from the look in his eye, Mr. Hankerson knew he was about to shoot and returned to his car. (Tr. 1317.)

Two days before the shooting, a man named Renaldo gave the gun used to kill Mr. Taylor to Petitioner, and at that same moment, Petitioner gave the gun to Mr. Hankerson who later gave it to Mr. Lawton. (Tr. 1319.)  Petitioner said at the time "he didn't want to deal with Mr. Lawton cause he thought Mr. Lawton might testify against him if any kind of slip-ups came up.  So he gave the gun to me and I gave it to Mr. Lawton." (Tr. 1320.)

Mr. Hankerson did not pick up Mr. Lawton after the shooting, but Mr. Lawton was at Mr. Hankerson's house when Mr. Hankerson returned home. (Tr. 1321.)  After the shooting, Mr. Hankerson drove around for a while, hung out on Marvin Street, picked up a girl, and returned to his house; Mr. Lawton was there, high on drugs. (Tr. 1321-22.)  Mr. Hankerson grabbed the pistol and asked why Mr. Lawton shot Mr. Taylor. (Tr. 1322.)  Mr. Lawton said he was dead now. (Tr. 1322.)  Mr. Hankerson took the pistol because he thought Mr. Lawton might kill him. (Tr. 1322-23.)  Mr. Hankerson met Petitioner one street over from Petitioner's

house to avoid other people, and he gave Petitioner the gun.  Petitioner asked, "if it was done."  Mr. Hankerson said, "I just left from up there and he killed him, man, he killed him."   (Tr. 1323.)

Mr. Hankerson gave two statements to the police, one of which left out facts about Renaldo providing the gun and the payment from Petitioner to Mr. Lawton. (Tr. 1326.)  He gave the second statement after Renaldo died.  (Tr. 1326.)  Mr. Hankerson decided to plead guilty to conspiracy because he was involved in the discussions to kill Mr. Taylor.  (Tr. 1327.)

Before the first Taylor murder trial, Petitioner wrote letters to Mr. Hankerson discussing Corey Bailey, who signed a statement recanting a prior statement that he heard Mr. Lawton say something about killing Mr. Taylor.  (Tr. 1332.)  The letter from Petitioner remarked Mr. Bailey would "do the right thing" because Petitioner "got his people" to talk to him. (Tr. 1333.)  Petitioner closed the letter by stating to Mr. Hankerson, "I told you I was on that shit" and advising Mr. Hankerson to not take a plea deal.  (Tr. 1333-36; <u>see also</u> Tr. 1445-47, 1450.)

**E.      Cross Examination of Mr. Hankerson**

Mr. Lawton knew Mr. Taylor before the shooting.  (Tr. 1345.)  On the night of the shooting, Mr. Lawton dropped off his car at Mr. Hankerson's house and left with someone else.  (Tr. 1347.)  He usually kept a car there and would often spend the night at Mr. Hankerson's house.  (Tr. 1346.)  Mr. Hankerson did not want Mr. Taylor killed, and even though he took the gun from Petitioner and gave it to Mr. Lawton, Mr. Hankerson told Mr. Lawton not to go through with it.  (Tr. 1348-49.)  Mr. Hankerson gave the gun to Mr. Lawton for self-defense because somebody else was trying to kill Mr. Lawton.  (Tr. 1350.)  The gun was for two purposes, self-defense and killing Mr. Taylor.  (Tr. 1353.)

7

In his first interview with Investigator Scott Peebles, Mr. Hankerson said that, just before the shooting, he was negotiating a price with two prostitutes at the Citgo store along with Mr. Taylor, then got in his car and heard the shots. (Tr. 1355-56.) He lied to Investigator Peebles because he "wasn't under arrest and I wasn't going to jeopardize myself." (Tr. 1356.) The next day, police brought Mr. Hankerson to the county jail where he met with Investigators Peebles and Richard Roundtree. (Tr. 1357.) He lied again by saying the same thing he told Investigator Peebles the day before. (Tr. 1358.) He did not tell the truth because it was not in his best interest at the time. (Tr. 1358.)

When Mr. Hankerson was indicted for murder and theft by receiving, prosecutor Willie Saunders served Mr. Hankerson with a notice that he would serve life without parole if convicted on either charge. (Tr. 1359-61.) After he was indicted and received the letter from Mr. Saunders, Mr. Hankerson met with Investigator Peebles a third time. (Tr. 1361.) Mr. Hankerson told his attorney he would talk only if he could get a deal. (Tr. 1361.) Mr. Sanders said he could offer no deal for his testimony, but Mr. Hankerson met with him anyway for a taped interview, with the assurance nothing he said could be used against him. (Tr. 1362.)

Mr. Hankerson denied touching Mr. Taylor on the shoulder at the Citgo store to mark him for death, so that Mr. Lawton would be certain he was killing the correct person. (Tr. 1364.) Mr. Hankerson lied about the source of the gun in the first two statements to Investigator Peebles, and only in the final statement did he identify Renaldo as the original source of the gun. (Tr. 1367-70.) Furthermore, Mr. Hankerson lied by telling investigators Petitioner's grudge against Mr. Taylor was in the past and Petitioner did not waste his time on things like that anymore. (Tr. 1371.)

Mr. Hankerson pled guilty to conspiracy to commit murder, which carries one to ten

years of imprisonment, and he was sentenced to three years of imprisonment. (Tr. 1373.) Mr. Hankerson did not tell the truth about Petitioner until his last statement, at a time when he was very concerned about the possibility of life in prison and the officers assured him nothing he said would be used against him. (Tr. 1375-76.) Furthermore, Mr. Hankerson knew the case theory the police were pursuing, which implicated Petitioner and Mr. Lawton, because he read it in the newspaper. (Tr. 1377-78.)

Petitioner had no reason to kill Mr. Taylor because Petitioner had already been acquitted in the second trial related to the drive-by shooting at the time of Mr. Taylor's death. (Tr. 1381-82.) Mr. Hankerson denied telling his son he would be facing life without parole and would do whatever it took not to go back to prison. (Tr. 1386.) In his first two statements to the police, Mr. Hankerson stated Petitioner was not involved in the shooting of Mr. Taylor. (Tr. 1388.)

### F.     Testimony of Investigator Scott Peebles

It is clear from the videotape Mr. Hankerson was involved in the shooting because of the way he pointed out Mr. Taylor to Mr. Lawton then left the scene at the same time and in the same direction as Mr. Lawton. (Tr. 1400.) During his first interview, Mr. Hankerson stated he left Mr. Lawton at his house alone, went to the store, and came directly home after the shooting. (Tr. 1406-07.) Mr. Lawton was not there but showed up fifteen minutes later. (Tr. 1407.)

Mr. Hankerson gave his first statement to Investigator Peebles on August 12, 2002. (Tr. 1498.) Mr. Hankerson said he was speaking with several girls at Mr. Taylor's car about sex, and he heard shots as he was leaving the store but did not get a good look at the suspect. (Tr. 1498-99, 1505.) He also said people on the street were pointing the finger at Willie

Abrams.  (Tr. 1499.)  Investigator Peebles admitted this was a lie by Mr. Hankerson.  (Tr. 1505.)  Mr. Hankerson also told Investigator Peebles he did not know who committed the murder, which Peebles admitted was also a lie.  (Tr. 1505.)  Mr. Hankerson also said he saw Mr. Abrams and Petitioner every other day and was sure neither committed the murder, which was a lie.  (Tr. 1506.)  Mr. Hankerson said they did not waste time with things like that anymore, which was also a lie.  (Tr. 1506.)

Mr. Hankerson gave his second statement to Investigator Peebles on August 13, 2002.  (Tr. 1497.)  In this statement, Mr. Hankerson lied again by saying he was speaking with several girls at Mr. Taylor's car about sex, and he heard shots as he was leaving the store but did not get a good look at the suspect.  (Tr. 1498-99, 1505.)  He also said again that people on the street were pointing the finger at Willie Abrams.  (Tr. 1499.)  Investigator Peebles admitted this was a lie.  (Tr. 1505.)  Mr. Hankerson told Investigator Peebles he did not know who committed the murder, which was also a lie.  (Tr. 1505.)  Mr. Hankerson said he saw Petitioner every other day and was sure he was not involved in the murder, which was a lie.  (Tr. 1506.)  He said Petitioner does not waste time with things like that anymore, which was also a lie.  (Tr. 1506.)

When Mr. Hankerson changed his story and provided a third statement on November 21, 2003, he had been charged with murder and wanted to cut a deal because of the potential for life without parole.  (Tr. 1509.)  Mr. Hankerson was dying of AIDS at the time.  (Tr. 1510.)

### G.   Testimony of Defense Witness Bacardrick Hankerson

Bacardrick Hankerson is the son of Charles Hankerson.  On the night of the murder, Bacardrick partied all night with Petitioner, went to bed at 2:00 a.m., and stayed at Petitioner's house overnight.  (Tr. 1532.)  During this time, Petitioner never left the house, and Bacardrick

never saw his father.  (Tr. 1532.)  Before dying, his father admitted to Bacardrick that he implicated Petitioner because he was diagnosed with a fatal illness and did not want to die in jail. (Tr. 1533-34.)  His father was a liar and should not be trusted to tell the truth while under oath.  (Tr. 1535-36.)

## III.   DIRECT APPEAL

Attorney Brian Steel represented Petitioner on appeal and raised four arguments:

(1)    Appellant's conviction for criminal solicitation to commit murder must be reversed as the prosecution failed to prove venue beyond a reasonable doubt;

(2)    The trial court wrongly commented on the evidence when it announced to the venire panel that the indicted offense of malice murder occurred in Richmond County.  This was an unlawful comment on the evidence by the trial court in violation of O.C.G.A.  § 7-8-57 and thus, all convictions and sentences must be reversed;

(3)    The evidence presented at trial to support the verdicts of guilty on both counts of the bill of indictment rested solely on the uncorroborated testimony of an accomplice, to wit: Mr. Hankerson.  Hence, Appellant's convictions and sentences must be reversed; and

(4)    The trial court caused harmful error by improperly admitting prior consistent statements of a critical prosecution witness. Hence, Appellant's convictions and sentences must be reversed.

(Doc. no. 10-13, pp. 6-57.)   The Supreme Court of Georgia rejected all of Petitioner's arguments and affirmed the judgment of conviction.  Lindsey II, 760 S.E.2d at 344.  Because the issues here, both factually and legally, overlap significantly with those before the Supreme Court of Georgia, a reader's detailed understanding of that decision is important and assumed.

## IV.    STATE HABEAS PETITION

Petitioner filed a *pro se* state habeas corpus petition on January 27, 2015, in the Superior

Court of Johnson County, and through counsel, amended his petition on October 15, 2015.

(Doc. nos. 10-1, 10-2.)  Petitioner raised the following claims:

(1)    Petitioner received ineffective assistance from appellate counsel when he failed to allege that trial counsel was ineffective for conducting an inadequate pretrial investigation;

(2)    Appellate counsel was ineffective for failing to allege trial counsel's ineffectiveness for failing to preserve his objection to the state's use of a recorded statement as improper bolstering; and

(3)    Appellate counsel was ineffective for failing to allege trial counsel's ineffectiveness for failing to seek a limiting instruction regarding the admission of a witness's testimony regarding other crimes and/or not objecting to the admission of extraneous details from a prior prosecution.

(Doc. no. 10-2.)  The state habeas court conducted an evidentiary hearing on October 15, 2015,

(doc. no. 10-6, p. 2), and denied relief on May 26, 2017.  (Doc. no. 10-3, Lindsey v. Emmons,

Case No. 2015-HC-4 (Johnson Cnty. Sup. Ct. May 24, 2017)).  The Supreme Court of Georgia

denied a certificate of probable cause to appeal ("CPC") without comment.  (Doc. no. 10-5,

Lindsey v. Emmons, No. S17H1815 (Ga. Sept. 3, 2019)).

## V.    CURRENT FEDERAL PETITION

Petitioner, through counsel, timely filed the current § 2254 petition, raising the

following claims for relief:

(1)    The Georgia Supreme Court's conclusion that the trial court did not violate [Petitioner's] Due Process rights, codified at O.C.G.A. § 17-8-57, by announcing where the alleged offense took place, was an unreasonable application of federal law;

(2)    Appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to object to the erroneous admission of evidence bolstering a deceased witness's testimony;

12

(3)   Appellate and trial counsel were ineffective for failing to impeach the only witness to corroborate the accomplice testimony against [Petitioner]; and

(4)   Appellate counsel was ineffective for failing to allege trial counsel's ineffectiveness when trial counsel failed to seek a limiting instruction regarding evidence from a prior murder trial at which [Petitioner] was acquitted.

(See doc. no. 1.)  Respondent argues federal relief should be denied on all claims either because the state court decision deserves deference or because Petitioner's claims are procedurally barred.  (See doc. nos. 9, 9-1.)

## VI.   STANDARD OF REVIEW

Under § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim - -

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Supreme Court has characterized § 2254(d) as "part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions."  Harrington v. Richter, 562 U.S. 86, 103 (2011).  Accordingly, § 2254(d) creates a "difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  Cullen v. Pinholster, 563 U.S. 170, 181 (2011) citations omitted).

In <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005), the Supreme Court explained the difference between the "contrary to" and "unreasonable application" clauses in § 2254(d)(1) as follows:

> A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result.  A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner.

<u>Id.</u> (internal citations omitted).  Thus, under § 2254(d)(1), it is not enough to demonstrate that a state court's decision is wrong; "even clear error will not suffice."  <u>White v. Woodall</u>, 572 U.S. 415, 419 (2014).  Rather, the habeas petition must show the state court decision was "objectively unreasonable."  <u>Wiggins v. Smith</u>, 539 U.S. 510, 520-21 (2003); <u>see also</u> <u>Woods v. Donald</u>, 575 U.S. 312, 316 (2015) (a petitioner must show the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").  A showing that the state court's determination was unreasonable is a substantially higher threshold than whether it was correct. <u>Reed v. Sec'y, Fla. Dep't of Corr.</u>, 767 F.3d 1252, 1260-61 (11th Cir. 2014); <u>Evans v. Sec'y, Dep't of Corr.</u>, 703 F.3d 1316, 1325 (11th Cir. 2013).  In addition, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  <u>Cullen</u>, 563 U.S. at 181.

Moreover, under AEDPA's highly deferential standard of review for state court factual determinations, a federal habeas court may only grant relief if a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

Additionally, § 2254(e)(1) requires the Court "to presume the correctness of state courts' factual findings" unless the habeas petitioner rebuts that presumption "with clear and convincing evidence." Nejad v. Att'y Gen., State of Ga., 830 F.3d 1280, 1289 (11th Cir. 2016) (citing Schriro v. Landrigan, 550 U.S. 465, 473-74 (2007)); see also Reese v. Sec'y, Fla. Dep't of Corr., 675 F.3d 1277, 1287 (11th Cir. 2012) ("In a habeas proceeding, our review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review."). "The Supreme Court has not yet defined § 2254(d)(2)'s precise relationship to § 2254(e)(1) . . . . Whatever that precise relationship may be, a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Tharpe v. Warden, 834 F.3d 1323, 1336 (11th Cir. 2016) (citing Wood v. Allen, 558 U.S. 290, 301 (2010)).

## VII.   DISCUSSION

### A.   Petitioner's Claim in Ground One Is Procedurally Defaulted to the Extent It Is Based on the U.S. Constitution, and Fails to the Extent It Is Based on State Law

#### 1.   A Federal Habeas Petitioner Defaults a Claim by Failing to Properly Exhaust State Remedies

AEDPA preserves the traditional exhaustion requirement, which requires a district court to dismiss unexhausted habeas claims the petitioner did not raise in state court, but could have raised by any available procedure. 28 U.S.C. § 2254(b)(1)(A) & (c). A state inmate is deemed to have exhausted his state judicial remedies when he has given the state courts, or they have otherwise had, a fair opportunity to address the federal claims. Castille v. Peoples, 489 U.S. 346, 351 (1989). "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas

petition." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999).

Moreover, giving the state courts an opportunity to act on a petitioner's claims includes allowing the state courts to complete the appellate review process. As the Supreme Court explained:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, we conclude that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

Id. at 845. This "one full opportunity" includes pursuing discretionary review with the highest available appellate court where the highest court of the state has not opted out of this requirement. Id. "Georgia's appeal process requires that a petitioner seek a certificate of probable cause to appeal to the Georgia Supreme Court; claims not raised in an application for a certificate of probable cause are considered unexhausted on subsequent federal habeas review. Sealey v. Warden, Ga. Diagnostic Prison, 954 F.3d 1338, 1364 (11th Cir. 2020) (citations omitted); see also Pope v. Rich, 358 F.3d 852, 853 (11th Cir. 2004) (per curiam) (ruling a petitioner's "failure to apply for a certificate of probable cause to appeal the denial of his state habeas petition to the Georgia Supreme Court means that [the petitioner] has failed to exhaust all of his available state remedies.").

"A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts." Henderson v. Campbell, 353 F.3d 880, 891 (11th Cir. 2003) (quoting Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001)). The exhaustion requirement applies with equal force to all constitutional claims. See Lucas v. Sec'y, Dep't of Corr., 682 F.3d 1342, 1351-54 (11th Cir. 2012); Footman v. Singletary, 978 F.2d 1207, 1211 (11th Cir. 1992). "Ultimately, 'to exhaust state remedies

fully[,] the petitioner must make the state court aware that the claims asserted present federal constitutional issues.'" <u>Preston v. Sec'y, Fla. Dep't of Corr.</u>, 785 F.3d 449, 457 (11th Cir. 2015) (citation omitted).   Furthermore, a petitioner's failure to exhaust his claims properly ripens into a procedural default once state remedies are no longer available.  <u>Clark v. Comm'r, Alabama Dep't of Corr.</u>, 988 F.3d 1326, 1329 (11th Cir. 2021), *cert. denied sub nom.* <u>Clark v. Hamm</u>, No. 21-6202, 2022 WL 516051 (U.S. Feb. 22, 2022).

A federal habeas petitioner can run afoul of procedural default rules in one of two ways, depending on whether the claim is an old one the petitioner already attempted to assert unsuccessfully in state court, or a new one the petitioner never attempted to raise in state court. First, a federal habeas petitioner cannot revive an old claim that a state court previously denied on independent and adequate procedural grounds.  "As a general rule, a federal habeas court may not review state court decisions on federal claims that rest on state law grounds, including procedural default grounds, that are 'independent and adequate' to support the judgment." <u>Boyd v. Comm'r, Ala. Dep't of Corr.</u>, 697 F.3d 1320, 1335 (11th Cir. 2012).

A state court decision rests on "independent and adequate" state procedural grounds when it satisfies the following three-part test:

> First, the last state court rendering a judgment in the case must clearly and expressly say that it is relying on state procedural rules to resolve the federal claim without reaching the merits of the claim.  Second, the state court decision must rest solidly on state law grounds, and may not be intertwined with an interpretation of federal law.  Finally, the state procedural rule must be adequate; *i.e.,* it may not be applied in an arbitrary or unprecedented fashion.  The state court's procedural rule cannot be "manifestly unfair" in its treatment of the petitioner's federal constitutional claim to be considered adequate for purposes of the procedural default doctrine.  In other words, a state procedural rule cannot bar federal habeas review of a claim unless the rule is "firmly established and regularly followed."

<u>Id.</u> at 1336 (internal quotations and citations omitted).  Additionally, the Supreme Court has

made clear that "a state procedural bar may count as an adequate and independent ground for denying a federal habeas petition even if the state court had discretion to reach the merits despite the default." Walker v. Martin, 562 U.S. 307, 311 (2011).

Second, a federal habeas petitioner runs afoul of procedural default rules when he attempts to bring a new claim in his federal petition that would be procedurally barred if he attempted to raise it in state court. In such instances, unless the petitioner either establishes the cause and prejudice or the fundamental miscarriage of justice exception, the failure to bring the claim properly in state court has "matured into a procedural default." Smith v. Jones, 256 F.3d 1135, 1138-39 (11th Cir. 2001). Thus, where a state procedural bar is apparent, a court "can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief." Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1342 (11th Cir. 2009) (citing Snowden v. Singletary, 135 F.3d 732, 736 (11th Cir. 1998)); Bailey v. Nagle, 172 F.3d 1299, 1303 (11th Cir. 1999). To determine whether a claim is procedurally barred in this way, the federal court must ask whether "it is clear from state law that any future attempts at exhaustion would be futile." See Bailey, 172 F.3d at 1305.

Simply put, if a claim has not been "fairly presented to the state courts, it is procedurally defaulted." Jones v. Campbell, 436 F.3d 1285, 1304 (11th Cir. 2006). To that end, absent a showing of either cause to excuse the default and actual prejudice or a fundamental miscarriage of justice, O.C.G.A. § 9-14-48(d) precludes state habeas review of any issue not preserved for collateral attack in a state court by timely objecting and raising the issue on appeal. See Devier v. Zant, 3 F.3d 1445, 1454-55 (11th Cir. 1993) (citing O.C.G.A. § 9-14-48(d) and upholding a finding of procedural default on numerous claims); see also Waldrip v. Head, 620 S.E.2d 829, 835 (Ga. 2005) ("Claims not raised on direct appeal are barred by procedural default, and in

order to surmount the bar to a defaulted claim, one must meet the 'cause and prejudice' test.");

Black v. Hardin, 336 S.E.2d 754, 755 (Ga. 1985) ("The rule now may be stated as follows:  a

failure to make timely objection to *any* alleged error or deficiency or to pursue the same on

appeal ordinarily will preclude review by writ of habeas corpus.").  In addition, Georgia law

prohibits the assertion of state habeas claims in any successive petition that could have been

asserted in the original state habeas petition.  O.C.G.A. § 9-14-51; Chambers v. Thompson,

150 F.3d 1324, 1327 (11th Cir. 1998) ("The Georgia statute restricting state habeas review of

claims not presented in earlier state habeas petitions can and should be enforced in federal

habeas proceedings against claims never presented in state court . . . .").

> **2.    Petitioner's Constitutional Claim in Ground One is Procedurally Defaulted, and He Is Not Entitled to Federal Relief on the State Law Component of His Claim**

Petitioner argues the Georgia Supreme Court incorrectly decided the trial court

committed no violation of O.C.G.A. § 17-8-57, and he further argues the trial court's violation

of this code section also constitutes a violation of his rights under the U.S. Constitution.  (Doc.

no. 8, pp. 13-17.)  On direct appeal to the Georgia Supreme Court, Petitioner did not raise a

federal constitutional claim but instead only argued the trial court's comments violated

O.C.G.A. § 17-8-57.  (Doc. no. 10-13, pp. 30-34); see Lindsey II, 760 S.E.2d at 346.  Because

Petitioner failed to put the state court on notice of any federal basis for his claim in Ground

One, he procedurally defaulted the constitutional aspect of his claim.  O'Sullivan, 526 U.S. at

848; Pope, 358 F.3d at 854; Preston, 785 F.3d at 457-59 (holding while petitioner need not use

particular words to present federal claim to state courts, petitioner must put state court on notice

he intended to raise federal claim).

To the extent Petitioner challenges the Georgia Supreme Court's determination of the

trial court committing no violation of § 17-8-57, he is not entitled to federal habeas corpus relief.  "Because state courts are the ultimate expositors of state law, we are bound by state-court determinations on state-law questions.  Put another way, "[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved."  Jones v. GDCP Warden, 815 F.3d 689, 722-23 (11th Cir. 2016) (internal citations and quotes omitted); see also Tuomi v. Sec'y, Fla. Dep't of Corr., 980 F.3d 787, 796 n.9 (11th Cir. 2020), *cert. denied sub nom.*, Tuomi v. Inch, 141 S. Ct. 1721 (2021) (same, collecting cases).  In sum, the federal habeas court does not sit as a "'super' state supreme court."  Shaw v. Boney, 695 F.2d 528, 530 (11th Cir. 1983) (*per curiam*) (citations omitted).

> **3.    Petitioner Cannot Satisfy the Cause and Prejudice Standard to Justify Federal Review of His Defaulted Claim, and the Miscarriage of Justice Exception Does Not Apply**

"A petitioner may obtain federal review of a procedurally defaulted claim if he can show both cause for the default and actual prejudice resulting from the default."  Jones, 436 F.3d at 1304 (citing Wainwright v. Sykes, 433 U.S. 72, 97 (1977)).  "Cause for a procedural default exists where something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . impeded [his] efforts to comply with the State's procedural rule."  Maples v. Thomas, 565 U.S. 266, 280 (2012) (internal quotation marks omitted).  "Once cause is proved, a petitioner also must prove prejudice.  He must show 'not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'"  Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)).

Petitioner has presented no valid justification for failing to raise his defaulted claim in Ground One at the proper time in his state proceedings, let alone something external to Petitioner which impeded his efforts.  In addition, Petitioner has failed to show the trial court's comment concerning where the alleged offense took place worked to his actual and substantial disadvantage.  As explained by the Georgia Supreme Court, "The comments at issue were made during the trial court's preliminary instructions to the venire, in which the court made plain that it was explaining what was alleged in the indictment against [Petitioner], not what had been proven in regard to [Petitioner's] culpability for the crimes on trial. There was no violation of O.C.G.A. § 17-8-57." Lindsey II, 760 S.E.2d at 173.

Indeed, the trial court stated expressly the defendants were *alleged* to have committed murder.  Furthermore, and just as importantly, it was undisputed at trial that the victim, Marcus Taylor, was in fact murdered on the night in question at a gas station, where the event was recorded on videotape and witnessed by many people.  The mere question "where did this take place" is clearly a reference to the murder itself, without any suggestion of guilt for the defendants on trial, and prejudice from such an innocuous question is an impossibility.  Accordingly, Petitioner has failed to demonstrate the cause and prejudice necessary to overcome his procedural default.

"Additionally, in extraordinary cases, a federal court may grant a habeas petition without a showing of cause and prejudice to correct a fundamental miscarriage of justice." Jones, 436 F.3d at 1304 (citing Murray v. Carrier, 477 U.S. 478, 496 (1986)).  The narrow fundamental miscarriage of justice exception encompasses the extraordinary instance in which a constitutional violation probably has resulted in the conviction of one actually innocent of the crime.  Murray, 477 U.S. at 496; see also Johnson, 256 F.3d at 1171 ("This exception is

exceedingly narrow in scope, as it concerns a petition's 'actual' innocence rather than his 'legal' innocence."). In <u>McQuiggin v. Perkins</u>, the Supreme Court held that this exception survived AEDPA's passage but "applies to a severely confined category: cases in which new evidence shows it is more likely than not that no reasonable juror would have convicted [the petitioner]." 569 U.S. 383, 395 (2013) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 329 (1995)). Petitioner does not argue, let alone submit any evidence, that he is probably, factually innocent of the crimes of which he was convicted. Accordingly, Ground One in the instant § 2254 petition has been defaulted and provides no basis for federal habeas relief.

**B. Applying AEDPA Deference to the Ineffective Assistance Claims Rejected by the Georgia Supreme Court, Federal Habeas Relief Is Not Warranted on Grounds Two, Three, and Four**

**1. Under <u>Strickland v. Washington</u>, Petitioner Bears a Heavy Burden on Ineffective Assistance of Counsel Claims**

Ineffective assistance of counsel claims are subject to the two-part test enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Under the first prong, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688. In this regard, "[a] petitioner must overcome a strong presumption of competence, and the court must give significant deference to the attorney's decisions." <u>Hagins v. United States</u>, 267 F.3d 1202, 1204-05 (11th Cir. 2001). "An attorney's actions need only fall within 'the wide range of professionally competent assistance' to pass constitutional muster," and "courts should not second-guess counsel's assistance" because "[e]ven the best criminal defense attorneys would not defend a particular client the same way." <u>Philmore v McNeil</u>, 575 F.3d 1251, 1260 (11th Cir. 2009) (citations omitted).

Strategic decisions are entitled to a "heavy measure of deference." Strickland, 466 U.S. at 691. "[A] court should be highly deferential to those choices made by defense counsel in the conduct of a trial that are arguably dictated by a reasonable trial strategy." Devier v. Zant, 3 F.3d 1445, 1450 (11th Cir. 1993). Indeed, "strategic choices are 'virtually unchallengeable.'" Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998) (citing Strickland, 466 U.S. at 690 and Waters v. Thomas, 46 F.3d 1506, 1522 (11th Cir. 1995) (en banc)). "Counsel will not be deemed unconstitutionally deficient because of tactical decisions, . . . and [t]he presumption of reasonableness is even stronger when we are reviewing the performance of an experienced trial counsel." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (internal citations omitted).

To show that an attorney's choice of strategy is unreasonable, a petitioner must show that no competent counsel would have made such a choice. Strickland, 466 U.S. at 690; Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983) (per curiam) ("Even if in retrospect the strategy appears to have been wrong, the decision will be held ineffective only if it was so patently unreasonable that no competent attorney would have chosen it." (citations omitted)). The purpose of this review is not to grade counsel's performance because, of course, every lawyer "could have done something more or different . . . . But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). Strickland requires application of a totality-of-the-circumstances standard because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Khan v. United States, 928 F.3d 1264, 1273 (11th Cir.) (citation omitted).

"Given the strong presumption in favor of competence, the petitioner's burden of persuasion – though the presumption is not insurmountable – is a heavy one." Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted). "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer . . . could have acted, in the circumstances, as defense counsel acted . . . ." Ward v. Hall, 592 F.3d 1144, 1164 (11th Cir. 2010) (citing Waters, 46 F.3d at 1512). "The reasonableness of counsel's performance is evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances . . . ." Michael, 430 F.3d at 1319 (citations omitted)

As emphasized by the Eleventh Circuit:

[D]eferential review under Strickland does not ask whether counsel could possibly or ideally have been more effective. "The test for ineffectiveness is not whether counsel could have done more." We do not ask whether an attorney's representation "deviated from best practices or common custom," and we should resist the temptation to second-guess an attorney with the benefit of our hindsight. Rather, Strickland asks only "whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." . . . We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. . . . We are not interested in grading lawyers' performances.

Jenkins v. Comm'r, Ala. Dep't of Corr., 963 F.3d 1248, 1269-70 (11th Cir. 2020) (internal citations omitted), cert. denied sub nom., Jenkins v. Dunn, 141 S. Ct. 2635 (2021).

A court, however, "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697; see Brooks v. Comm'r, Ala. Dep't of Corr., 719 F.3d 1292, 1301 (11th Cir. 2013).

Under the prejudice prong of <u>Strickland</u>, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694.

As the Eleventh Circuit has ruled, a petitioner must affirmatively prove prejudice that would undermine the results of the proceedings because "attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. That the errors had some conceivable effect on the outcome of the proceeding is insufficient to show prejudice." <u>Butcher v. United States</u>, 368 F.3d 1290, 1293 (11th Cir. 2004) (citations and internal quotations omitted).   Indeed, the Court must examine the entirety of counsel's performance and the effect of such "in light of the record as a whole to determine whether it was reasonably probable that the outcome would have been different." <u>Lancaster v. Newsome</u>, 880 F.2d 362, 375 (11th Cir. 1989).

The <u>Strickland</u> test also applies to claims of ineffective assistance of appellate counsel, <u>see</u> <u>Heath v. Jones</u>, 941 F.2d 1126, 1130 (11th Cir. 1991), with the additional consideration that a criminal defendant has no "constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983); <u>see also</u> <u>Philmore</u>, 575 F.3d at 1264 (explaining appellate counsel not required to raise every non-frivolous issue).   "Appellate counsel is not ineffective for failing to raise claims 'reasonably considered to be without merit.'" <u>United States v. Nyhuis</u>, 211 F.3d 1340, 1344 (11th Cir. 2000) (citation omitted).   Moreover, it is up to appellate counsel to winnow out weaker arguments, even if they may have merit, and select the most promising issues for review.

Jones, 463 U.S. at 751-52; Philmore, 575 F.3d at 1264.  Prejudice turns on whether "the neglected claim would have a reasonable probability of success on appeal."  Philmore, 575 F.3d at 1265 (citation omitted).

In the context of an ineffective assistance claim that was previously rejected by a state court, the petitioner bears the even heavier burden of "show[ing] that the [state courts] applied Strickland to the facts of his case in an objectively unreasonable manner."  Bell v. Cone, 535 U.S. 685, 699 (2002); see also Cave v. Sec'y for Dep't of Corr., 638 F.3d 739, 748 (11th Cir. 2011) (noting that, where the state court has previously adjudicated a claim on the merits, the petitioner "has the additional burden of demonstrating that the state court's application of this demanding standard was not merely wrong, but objectively unreasonable").  "[I]t is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly."  Bell, 535 U.S. at 699.  "In short, an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  Barwick v. Sec'y, Fla. Dep't of Corr., 794 F.3d 1239, 1245 (11th Cir. 2015) (internal quotations and citations omitted).  "Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Richter, 562 U.S. at 105.  Stated otherwise, federal habeas corpus relief is available on a Strickland claim "only if the state habeas court *unreasonably* determined that trial counsel performed reasonably - *i.e.*, where there is no possibility fairminded jurists could disagree that defense counsel acted outside the range of professionally competent assistance."  Ledford v. Warden, Ga. Diagnostic Prison, 975 F.3d 1145, 1158 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2832

(2021) (citations omitted).  For Petitioner "to prevail, then, he would have to show that *no* reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct."  Raheem v. GDCP Warden, 995 F.3d 895, 909 (11th Cir. 2021).

"Surmounting Strickland's high bar is never an easy task."  Richter, 562 U.S. at 105 (citing Padilla v. Kentucky, 559 U.S. 356, 371 (2010)).  Moreover, because "[t]he standards created by Strickland and § 2254(d) are both highly deferential, . . . when the two apply in tandem, review is doubly so."  Richter, 562 U.S. at 105 (quotation marks and citations omitted); see also Yarborough v. Gentry, 540 U.S. 1, 4 (2003) (review of attorney performance is "highly deferential-and doubly deferential when it is conducted through the lens of federal habeas").  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment . . . .  [F]ederal courts are to afford both the state court and the defense attorney the benefit of the doubt."  Woods v. Etherton, 578 U.S. 113, 117 (2016) (*per curiam*) (internal quotations and citations omitted).

To summarize, for Petitioner to obtain federal habeas relief, "[t]he state court decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id.  That is, if fairminded jurists could reach differing conclusions, this Court owes deference to the state court decision, and federal relief is not available.  Shinn v. Kayer, 592 U.S.-, 141 S. Ct. 517, 525 (2020) (*per curiam*) "Or, in more concrete terms, a federal court may grant relief only if *every* 'fairminded juris[t]' would agree that *every* reasonable lawyer would have made a different decision" *Dunn v. Reeves*, 141 S. Ct. 2405, 2411 (2021) (emphasis added) (quoting Richter, 562 U.S. at 105); see also Sexton v. Beaudreaux, 138 S. Ct. 2555, 2560 (2018) ("[B]ecause the Strickland

standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." (citation omitted)); Woods, 575 U.S. at 316 ("AEDPA's standard is intentionally difficult to meet.").

>   **2.    The State Habeas Court's Application of Strickland to Petitioner's Ineffective Assistance Claims in Grounds Two, Three, and Four Was Not Objectively Unreasonable**

Petitioner raises three ineffective assistance of counsel claims related to both appellate and trial counsel, all of which were rejected by the state habeas court.  The Georgia Supreme Court denied the request for a certificate of probable cause in a two-sentence order:  "Upon consideration of the application for certificate of probable cause to appeal the denial of habeas corpus, it is ordered that it be hereby denied.   All the Justices concur."  (Doc. no. 10-5.) Because the state supreme court decision did not come accompanied with reasons, this Court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" when determining, pursuant to 28 U.S.C. § 2254(d), whether the state court decision was reasonable.  Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).  The Court is also guided by AEDPA's mandate that factual determinations made by a state court are presumptively correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).   "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  Tharpe, 834 F.3d at 1336.

Thus, the Court turns its attention to the state habeas court reasoning, as it is the last state court to decide Petitioner's federal ineffective assistance of appellate and trial counsel claims in a reasoned opinion.  See Wilson, 138 S. Ct. at 1192.  As discussed below, the state habeas court correctly identified and applied the Strickland analysis to determine Petitioner

28

did not show counsel's performance was objectively unreasonable or that he was prejudiced by counsel's performance.  (See doc. no. 10-3.)

        a.        **The State Court's Application of <u>Strickland</u> to Petitioner's Ineffective Assistance Claim in Ground Two Was Not Objectively Unreasonable**

In Ground Two, Petitioner argues Mr. Steel was ineffective for failing to allege on appeal that trial counsel, Mr. Berne, was ineffective for failing to object as improper bolstering to the playing in court for the jury of Mr. Hankerson's third interview with police, which was consistent with his trial testimony.  Rather than asserting ineffectiveness of trial counsel, Mr. Steel raised the issue on appeal as one of error by the trial court in admitting the prior consistent statement.  The Georgia Supreme Court rejected the argument, finding trial counsel acquiesced to the jury hearing the prior statement subject to one objection made on confrontation grounds, and trial counsel did not object on the basis of improper bolstering.  <u>Lindsey II</u>, 760 S.E.2d at 349-50.

The state habeas court rejected the claim of ineffectiveness by appellate counsel, finding Petitioner failed to show deficient performance or prejudice.  In support, the habeas court cited Mr. Steel's testimony that he believed the improper bolstering argument was a "strong issue" on appeal, and he believed there was a proper basis in the record for a finding that trial counsel made a proper objection, but the Georgia Supreme Court disagreed.  (Doc. no. 10-3, p. 10.)  The state habeas court credited Mr. Steel for raising the issue on appeal, found Mr. Steel thoroughly reviewed the record and raised the issues he believed had the greatest merit, and concluded such decisions regarding strategy and tactics do not establish ineffective assistance.  (<u>Id.</u> at 10-11.)  In conclusion, the court found "Petitioner has thus failed to show trial counsel's performance was deficient or that he was prejudiced by counsel's representation

as Petitioner has failed to show that the result of the proceeding would have been different had appellate counsel represented him differently." (Id.)

### i.       Background

Trial counsel, Mr. Berne, attended Emory University School of Law and was admitted to the State Bar of Georgia after graduating from law school in 1987. (Doc. no. 10-12, pp. 236-37.) Mr. Berne began his legal career with the DeKalb County Public Defender's Office before moving to the Federal Defender Program in Atlanta, Georgia. (Id. at 237.) Mr. Berne opened his own practice in 1991 with the majority of his cases being criminal defense in state and federal court. (Id.) Mr. Berne met with Petitioner, developed a strategy in the case, and filed all motions he deemed appropriate. (Id. at 237-38.)

Appellate counsel, Mr. Steel, graduated from Fordham Law School in 1990 and was admitted to the State Bar of Georgia in 1991. (Doc. no. 10-6, p. 9.) Since his admission, Mr. Steel has specialized in criminal defense. (Id. at 10.) Mr. Steel followed his standard practice for every appeal of thoroughly reviewing the trial transcripts, interviewing witnesses, speaking with jurors, and discussing the case with Petitioner and trial counsel. (Id. at 15-16, 19.) After obtaining input from Petitioner, Mr. Steel raised on appeal the issues he believed had the most merit and best chance to lead to reversal of Petitioner's convictions. (Id. at 17.)

In the motion for new trial, Mr. Steel raised a claim of ineffective assistance of trial counsel for Mr. Berne's failure to object to admission of the prior consistent statement by Mr. Hankerson.[2] (See id. at 13-15.) The trial court denied the motion for new trial on this and all other grounds. (See id. at 17.) On appeal, Mr. Steel abandoned the ineffective assistance claim

---

[2]At the time of Petitioner's second trial, Mr. Hankerson had passed away from acquired immunodeficiency syndrome (AIDS). (Doc. no. 10-12, pp. 10-11.)

he lost before the trial court, and instead argued the trial court committed error by allowing admission of the prior consistent statement.  (Id. at 47-49; doc. no. 10-13, pp. 53-56.)  The Georgia Supreme Court ruled this issue was waived when Mr. Berne acquiesced to the jury hearing the content of Mr. Hankerson's taped statements and voiced no objection when the trial court stated the tape would be played for the jury.  Lindsey II, 760 S.E.2d at 175-76.  At the state habeas hearing, Mr. Steel testified that while he considered the improper admission of the prior consistent statement a strong issue, it was not properly preserved for appeal because Mr. Berne's objections were not specific enough.  (Doc. no. 10-6, pp. 48-49.)

### ii.    Analysis

Petitioner argues Mr. Steel provided ineffective assistance by failing to allege ineffective assistance of trial counsel.  The state habeas court determined Petitioner had not shown deficient performance or prejudice because (1) Mr. Steel thoroughly reviewed the evidence and raised the issues on appeal he believed were the most compelling, including raising the improper bolstering issue as trial court error rather than deficient trial counsel performance, which is strategy that deserves deference; and (2) Petitioner failed to show the result of the proceedings would have been different but for the alleged deficient performance.  (Doc. no. 10-3, p. 11.)  Petitioner fails to show error in the state habeas decision that was "well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Woods, 575 U.S. at 316.  Indeed, several compelling reasons support the state habeas court's finding of no deficient performance and no prejudice.

Because Petitioner raises his challenge as an ineffective assistance of appellate counsel claim, there must be a showing of merit to an underlying ineffective assistance of trial counsel claim for not objecting to admission of Mr. Hankerson's prior consistent statement.  See Payne

v. Allen, 539 F.3d 1297, 1314-15 (11th Cir. 2008).  At the state habeas hearing, Mr. Berne testified he did not object to admission of Mr. Hankerson's prior consistent statement because it was merely redundant of Mr. Hankerson's trial testimony, he did not feel such an objection would have been successful, and an objection "may work to instead have the jury focus more on the statements."  (Doc. no. 10-6, p. 67.)[3]

An objection at trial would have likely succeeded.  However, there is considerable merit to Mr. Berne's strategic decision that asserting an objection was not advisable because the prior consistent statement was merely redundant of Mr. Hankerson's trial testimony, and objecting might make the prior consistent statement seem, to the jury, more important and harmful to the defense than it actually was.  The prior consistent statement was not profound. It was merely cumulative of Mr. Hankerson's trial testimony.  As Mr. Berne so effectively brought out on cross examination, Mr. Hankerson made the prior consistent statement during his third interview with police, and only after receiving formal notice of a potential life sentence and becoming interested in striking a deal with the State.  Moreover, as Mr. Berne also effectively highlighted on cross examination, this prior consistent statement was a complete reversal of the story he told during his first two police interviews.  To make matters worse for Mr. Hankerson, trial counsel called his own son to testify his father was a liar,

---

[3]Petitioner asserts Mr. Berne's explanation "holds little water" because he "moved in limine and twice prior to the playing of the recording, outside of the jury's presence, to have it excluded."  (Doc. no. 8, p. 29.)  However, Mr. Berne sought to exclude Mr. Hankerson's recorded testimony from the first trial, not his recorded prior consistent statement to law enforcement.  (Doc. no. 10-6, pp. 80-103.)  Rather than objecting to admission of the prior statement, Mr. Berne suggested it be read into the record and reiterated only his objection to playing Mr. Hankerson's trial testimony.  (Doc. no. 10-10, p. 191; doc. no. 10-11, p. 242.)

implicated Petitioner only because he was diagnosed with a terminal illness, and would say anything to avoid dying in prison.

One could make a forceful argument that Mr. Berne's deft use of the prior consistent statement was impressive trial strategy, and at the very least there is ample support for the state habeas court's finding Mr. Berne's treatment of the issue was not constitutionally deficient performance.  Mr. Steel cannot be said to have been deficient in his strategic decision to avoid an ineffective assistance of counsel argument on appeal and, instead, focus on the much simpler argument of trial court error.  Indeed, Mr. Steel raised the very same ineffective assistance of trial counsel claim in his motion for new trial, and it failed.  See Griffin v. Wainwright, 760 F.2d 1505, 1513 (11th Cir. 1985) (Notwithstanding the possibility that other lawyers may have employed another strategy, a finding of constitutionally ineffective representation is not automatically mandated.")

Mr. Steel testified that, when choosing which claims to pursue on appeal, he must consider "hurdles of ineffectiveness" and determine whether trial counsel's representation was guided by legitimate trial strategy.  (Doc. no. 10-6, p. 52.)  If trial counsel's representation was guided by legitimate trial strategy, Mr. Steel reasoned the issue would be "ruin[ed] on appeal if it was objectively reasonable."  (Id.)  After reviewing and considering the issues he raised in the motion for new trial, including Mr. Berne's reasoning for not objecting to the use of Hankerson's prior consistent statement, Mr. Steel raised only those issues he believed had the greatest merit on appeal.  Thus, as the state habeas court recognized, "Strategy and tactics do not establish ineffective assistance of counsel."  (Doc. no. 10-3, p. 11 (citing Ray v. State, 560 S.E.2d 54, 55 (Ga. Ct. App. 2002).)

The state habeas court also correctly determined there is no prejudice.  The Eleventh

Circuit has explained the <u>Strickland</u> prejudice analysis in this specific context as follows:

> An ineffective-assistance-of-appellate-counsel claim that challenges the failure
> to bring a claim can be successful only if there is a reasonable probability that
> the omitted issue would have affected the outcome.  *Cross v. United States,* 893
> F.2d 1287, 1290 (11th Cir. 1990).  Thus, although Hawes claims that
> his appellate counsel was ineffective, the analysis collapses to whether the
> underlying issue (here, ineffective assistance of trial counsel) is meritorious.
> *Id.*

<u>Hawes v. Perry</u>, 633 F. App'x 720, 725 (11th Cir. 2015).  Applying this collapsed analysis, the

<u>Hawes</u> court determined the petitioner was prejudiced by appellate counsel's error in failing

to raise ineffective assistance of trial counsel because there was a reasonable probability of an

acquittal had trial counsel laid a proper foundation for admission of critical exculpatory

evidence.  <u>Id.</u> at 726-27.

Application of this collapsed analysis here requires the opposite conclusion.  There was

no reasonable probability of an acquittal had Mr. Berne asserted a timely and successful

objection to the prior consistent statement because Mr. Hankerson's trial testimony would have

remained in evidence.  Quite obviously, the State's case relied in large part on the testimony

of Mr. Hankerson, and his credibility loomed large over the trial.  But as explained above, the

prior consistent statement was merely cumulative of his trial testimony and, more importantly,

the timing and circumstances of Mr. Hankerson providing this third statement to the police

was compelling evidence his trial testimony was not credible.  The prior consistent statement

did not add critical weight to Mr. Hankerson's testimony and likely, instead, detracted from it.

The jury had ample reason to disbelieve Mr. Hankerson, and there mere fact jurors learned Mr.

Hankerson said the same things in his third police interview that he said at trial does not raise

a reasonable probability of a different outcome.  Stated differently, there is no reasonable

probability the jury would have rejected Mr. Hankerson's testimony as not credible but for hearing the prior consistent statement.

The state habeas court's finding of no prejudice finds additional support in the other evidence presented by the State in addition to Mr. Hankerson's testimony, which as detailed by the Supreme Court of Georgia include the following:  (1) the timing and circumstances of Mr. Taylor's murder, which support a finding of Petitioner being the mastermind; (2) Petitioner had ample motive to kill Mr. Taylor, at first to prevent him from testifying in the Rosa Barnes retrial and then as retribution for Mr. Taylor having testified twice against him; (3) the testimony of Investigator Lynch concerning the animus Petitioner displayed toward Mr. Taylor during the first Rosa Barnes trial; (4) the testimony of Ms. Mobley that, during the second Taylor murder trial, she received anonymous phone calls attempting to intimidate her into not testifying; and (5) incriminating jailhouse letters that Mr. Hankerson testified he received from Petitioner concerning Petitioner's efforts to force recantation from another witness in the Taylor murder trial, which the Supreme Court of Georgia noted could have been authenticated by circumstantial evidence even in the absence of Mr. Hankerson's testimony.   Lindsey II, 760 S.E.2d at 174-75.

A discussion of prejudice would not be complete without explaining a critical difference between the analysis here and the analysis performed by Georgia courts when considering on appeal the prejudice associated with improper bolstering of a witness by admission of a prior consistent statement.  To determine whether improper bolstering requires reversal, Georgia courts consider whether it is highly probable the error did not contribute to the jury's guilty verdict, and they make this determination "without reliance on the testimony that was improperly bolstered, as the very nature of the error is that is repetitive of that to

which the witness has already testified." McGarity v. State, 856 S.E.2d 241, 249 (Ga. 2021). Strickland prejudice, in contrast, contains no mechanism to remove the entirety of Mr. Hankerson's testimony from consideration.   Instead, the question is whether sufficient performance by trial counsel would have likely changed the outcome, i.e., would the jury likely have acquitted Petitioner if the jury heard Mr. Hankerson's entire trial testimony but not his prior consistent statement to police?  See Hayes v. Sec'y, Fla. Dep't of Corr., 10 F.4th 1203, 1210 (11th Cir. 2021).  This is one of the "hurdles of ineffectiveness" to which Mr. Steel referred as good reason to attempt a trial court error claim on appeal rather than ineffective assistance of trial counsel.

Just as importantly, Petitioner would have likely lost the appeal on the merits even if Mr. Berne had asserted a timely objection at trial that preserved the improper bolstering issue for appeal.  This is because Georgia courts do not reverse where, as here, the improper bolstering does not add critical weight to the testimony but is instead merely cumulative of the witness's trial testimony.  Castaneda v. State, 861 S.E.2d 171, 179-80 (Ga. Ct. App. 2021).

In sum, the state court's decision to reject this claim was not an unreasonable application of Strickland or based on an unreasonable determination of the facts in light of the evidence presented.  This claim provides no basis for federal habeas corpus relief.

b.   **The State Court's Application of Strickland to Petitioner's Ineffective Assistance Claim in Ground Three Was Not Objectively Unreasonable**

In Ground Three, Petitioner argues Mr. Berne was ineffective for not conducting a background check of Denise Mobley, and appellate counsel was ineffective for not raising Mr. Berne's ineffectiveness.  The state habeas court found this claim lacked merit under Strickland, concluding Petitioner "failed to show trial counsel's performance was deficient or that he was

prejudiced by counsel's representation as Petitioner has failed to show a likelihood that the outcome would have been different had appellate counsel represented Petitioner differently." (Doc. no. 10-3, pp. 8-9.)

### i.      Background

Because Mr. Hankerson was an accomplice in the murder of Mr. Taylor, the State had to present the testimony of at least one other witness or other corroborating circumstances in order to sustain a conviction, pursuant to O.C.G.A. § 24-4-8.  On direct appeal, Petitioner argued his conviction must be reversed because it rested solely on the uncorroborated testimony of Mr. Hankerson.  (Doc. no. 10-13, pp. 34-52.)  The Georgia Supreme Court rejected this claim, finding Mr. Hankerson's testimony corroborated by several facts offered by the State at trial, including Ms. Mobley's testimony that she received threatening, anonymous phone calls in an attempt to keep her from testifying.  Lindsey II, 760 S.E.2d at 175.  The Court concluded, "a reasonable and plain inference to be drawn is that [Petitioner] made the calls or that they were made at his instigation." Id. at 174.  This plain inference, the Court found, was, "uncontradicted at trial," and corroborated Mr. Hankerson's testimony.  Id. at 175.

Ms. Mobley has two felony convictions for forgery in 1994 and financial transaction fraud in 1998, both of which Mr. Berne was unaware of at the time of trial.  (Doc. no. 10-6, pp. 65-66.)  Mr. Berne testified at the state habeas hearing he did not conduct a background investigation on Ms. Mobley because "[he] made a decision that she was a favorable witness to [Petitioner].  And that [he] did not want to impeach a witness that was going to provide exculpatory evidence regarding [his] client."  (Id. at 66.)  Through Ms. Mobley's testimony, Mr. Berne was able to establish that Mr. Taylor had a prior conviction for cocaine possession.

This was consistent with Mr. Berne's theme at trial that Mr. Taylor's death was related to his involvement with drugs rather than retribution for his testimony at the Rosa Barnes trial.  Mr. Berne explained he did not believe Ms. Mobley's testimony concerning the anonymous and intimidating phone calls she received "carried much, if any, weight because she was questioned by the State, and . . . there was no connecting" Petitioner, either directly or indirectly, with the threatening phone calls.  (Id.)

At the state habeas hearing, Mr. Steel testified Mr. Berne informed him Ms. Mobley testified "very favorably for [Petitioner]" by providing information to corroborate the defense theory that Mr. Taylor died because of his involvement with drugs.  (Id. at 41.)  Mr. Steel explained he was unaware of Ms. Mobley's impeachable offenses and did not conduct a background check on any of the witnesses.  (Id. at 42-43.)  However, even if he were aware at the time he filed Petitioner's direct appeal, he would not have raised Mr. Berne's alleged ineffectiveness "because the issue with Mobley corroborating the accomplice was never contemplated by [him] . . . and [he] never thought the Supreme Court would find [Mobley's testimony] corroborating circumstance [sic] of accomplice."  (Id. at 45.)

### ii.      Analysis

The state habeas court determined Petitioner failed to show deficient performance by either Mr. Steel or Mr. Berne, and there was no prejudice.  (Doc. no. 10-3, pp. 8-9.)  In support, the habeas court cited (1) Mr. Steel's testimony that he raised all issues on appeal he believed to be of merit; (2) Mr. Steel's testimony he would not have raised this issue on appeal even if he had known about Ms. Mobley's criminal history because he never considered the possibility of the Georgia Supreme Court finding Ms. Mobley's testimony to be corroborating; and (3) Mr. Berne's testimony he did not impeach Ms. Mobley because her testimony was favorable

for the most part, and the only damaging testimony concerned the anonymous, threatening phone calls for which there was no direct evidence of a connection to Petitioner. (Id.)

Petitioner presents nothing demonstrating there was an error in the state habeas decision about the ineffective assistance claim that was "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Woods, 578 U.S. at 117. Strategic choices regarding lines of defense do not constitute deficient performance so long as they are based on reasonable professional judgments at the time of trial. Strickland, 466 U.S. at 681. Trial counsel's reasonable decision to refrain from impeaching Ms. Mobley, in light of the information she provided that was consistent with the defense theory, is entitled to a "heavy measure of deference" and "virtually unchallengeable." Strickland, 466 U.S. at 691; Provenzano, 148 F.3d at 1332; see also Nyhuis, 211 F.3d at 1344 (explaining appellate counsel is not ineffective for failing to raise a meritless claim).

Petitioner argues Mr. Berne should have foreseen at trial the potential for the Supreme Court of Georgia to characterize Ms. Mobley's testimony concerning the threatening phone calls as corroborative of Mr. Hankerson's testimony. Perhaps a preeminent attorney performing at his or her peak could predict such future events and perform mitigative measures on the fly at trial, but that is not the standard. Mr. Berne's failure to predict and mitigate, in the manner argued by Petitioner with the benefit of hindsight, is not deficient performance. See Strickland, 446 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.").

The same can be said of the state habeas court's finding Mr. Steel's performance was not deficient. The inability of Mr. Steel to forecast the characterization of Ms. Mobley's testimony as corroborative cannot constitute ineffective assistance. At the time of the appeal,

Ms. Mobley reasonably appeared to be a relatively unimportant witness who provided favorable testimony supporting the defense theory while offering no specifics concerning the threatening phone calls that would have tied them to Petitioner. The strategic decision to focus on seemingly more important issues in the appeal does not constitute deficient performance. In this context, the state court's decision to reject Petitioner's claim was not an unreasonable application of Strickland or based on an unreasonable determination of the facts in light of the evidence presented.

Nor is the state habeas court's finding of no prejudice unworthy of due deference. It is a stretch to contend the jury would have acquitted Petitioner had they only known of Ms. Mobley's prior convictions. Nor is it likely the Georgia Supreme Court would have abandoned its reliance on Ms. Mobley's testimony as corroborative of Mr. Hankerson's testimony had the court only known of her prior convictions. Moreover, as explained *infra* in § VII(B)(2)(a)(ii), the Georgia Supreme Court cited additional evidence as corroborative of Mr. Hankerson's testimony. Lindsey II, 760 S.E.2d at 174-75. For these reasons, this claim provides no basis for federal habeas corpus relief.

> c.     **The State Court's Application of Strickland to Petitioner's Ineffective Assistance Claim in Ground Four Was Not Objectively Unreasonable**

In Ground Four, Petitioner argues Mr. Steel was ineffective for not raising Mr. Berne's failure to seek an instruction limiting the jury's consideration of Investigator Lynch's testimony regarding Rosa Barnes's murder to evidence of motive. The state habeas court concluded Petitioner "failed to show trial counsel's performance was deficient or that he was prejudiced by counsel's representation because Petitioner failed to show the outcome would have been different had appellate counsel represented him differently." (Doc. no. 10-3, pp.

13-14.)

### i.      Background

In its decision reversing Petitioner's conviction in the first trial, the Supreme Court of Georgia explained "[t]he facts surrounding the shooting of Rosa Barnes and Taylor's participation in the trial against [Petitioner] are relevant and admissible to establish [Petitioner's] motive in arranging Taylor's murder." Lindsey I, 651 S.E.2d at 70.  However, "for purposes of retrial . . . the scope of the evidence should [be] limited to establish Lindsey's motive for Taylor's murder. The minute details of the Rosa Barnes murder investigation are unnecessary and are irrelevant to the issues on trial." Id. at 71 n.6.

Before the second trial, Mr. Berne moved to limit the scope of evidence concerning the Rosa Barnes case to only facts directly related to motive.  (Doc. no. 10-9, p. 135.)  The court denied the motion but cautioned the State not to "beat a dead horse" or place a burden on Petitioner to retry the Rosa Barnes murder case.  (Doc. no. 10-6, pp. 109-10.)  At trial, Investigator Lynch testified concerning various facts of the Rosa Barnes murder as summarized infra in § II(B).  While Mr. Berne did not request a limiting instruction, he believed the trial court planned to give one because, at the pretrial hearing, the trial court announced the intention to give the jury a cautionary statement concerning evidence about the Rosa Barnes murder trial.  (Doc. no. 10-6, p. 63.)

### ii.      Analysis

At the state habeas hearing, Mr. Steel testified he would have requested a limiting instruction at trial if he were trial counsel to ensure the jury understood facts concerning the murder of Ms. Barnes was admissible solely for the purpose of motive.  (Doc. no. 10-6, p. 29.)  Mr. Steel raised the absence of a limiting instruction in the motion for new trial but not in the

appeal.  (Id. at 40.)  He did not raise it on appeal because he did not believe the issue had merit, explaining, "I didn't think that that issue, based upon the record that we had after my work, was going to have merit."  (Id.)

The state habeas court rejected this ground for relief, finding Mr. Steel's performance as appellate counsel was neither deficient nor prejudicial because (1) Mr. Steel reasonably decided, after a thorough investigation, the limiting instruction argument was not strong enough to raise on appeal because the critical issue of motive hinged on the underlying facts of the Rosa Barnes case; and (2) both Mr. Berne and the prosecutor made effective and compelling arguments concerning motive based on those underlying facts.  (Doc. no. 10-3, pp. 13-14.)

The state habeas court's rejection of this ground was not an unreasonable application of Strickland or based on an unreasonable determination of the facts in light of the evidence presented.  Indeed, the record is clear that Mr. Steel is a talented and diligent appellate attorney who thoroughly reviewed the evidence when preparing the appeal and carefully chose the issues he believed had the strongest chance of winning.  The mere absence of the limiting instruction touted by Petitioner was a weak appellate argument, in Mr. Steel's mind, because of the direct relevance between the facts underlying the Rosa Barnes murder trial and Petitioner's alleged motive for the murder of Mr. Lawton.  The rationale is compelling, far from unreasonable, and nothing approaching the type of serious error that renders counsel's performance constitutionally wanting.

Nor is it reasonably probable the outcome would have been different, at trial or on appeal, had Mr. Berne requested a limiting instruction or Mr. Steel alleged ineffective assistance on appeal for Mr. Berne's failure to make such a request.  It is highly unlikely the

jury would have acquitted Petitioner had they merely been instructed to consider evidence from the Rosa Barnes murder trial only in the context of determining motive for the murder of Mr. Taylor. See Perkins v. Dunn, No. 7:14-CV-1814-SLB, 2019 WL 4538737, at *65 (N.D. Ala. Sept. 19, 2019) (finding lack of limiting instruction non-prejudicial when slight distinction between evidence of intent and propensity would not have led jury to different outcome). This claim provides no basis for federal habeas corpus relief.

## VIII.  CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** the § 2254 petition be **DENIED**, this civil action be **CLOSED**, and a final judgment be **ENTERED** in favor of Respondent.

SO REPORTED and RECOMMENDED this 4th day of March, 2022, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA